# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| TERI L. SHROUT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV 1945JAR(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Teri Shrout for child's insurance benefits[1] based on disability and supplemental security income under Titles II and XVI of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 19). Defendant has filed a Brief in Support of the Answer. (Doc. No. 22). Plaintiff has filed a Reply. (Doc. No. 25).

---

[1]To be eligible for disabled child benefits, a claimant must prove that she is under a disability that began before age 22 and existed at the time of the claimant's application for benefits. 42 U.S.C. § 402(d)(1)(B)(ii). Plaintiff was twenty at the time she filed her application. Because plaintiff was more than eighteen years of age when she filed her application, the ALJ was required to consider her case using the five-step sequential evaluation process that applies to adults. See 20 C.F.R. § 416.920(a)(2).

## **Procedural History**

On November 1, 2007, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on September 16, 2006.  (Tr. 119-29).  This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated March 10, 2010.  (Tr. 56-57, 9-17).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on October 11, 2011.  (Tr. 5, 1-3).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## **Evidence Before the ALJ**

### **A.    ALJ Hearing**

Plaintiff's administrative hearing was held on January 5, 2010.  (Tr. 23).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was Terry Bartlow, vocational

expert.  (Id.).

In an opening statement, plaintiff's attorney indicated that plaintiff was twenty-two years

of age but has significant mental impairments.  (Tr. 25).  Plaintiff's attorney stated that plaintiff

has a few physical problems, but her mental impairments are her main problem.  (Id.).  Plaintiff's

attorney stated that plaintiff's condition nearly meets a listing and would certainly equal a listing.

(Id.).

The ALJ examined plaintiff, who testified that she lived with her two children and the

children's father.  (Id.).  Plaintiff stated that she completed high school.  (Tr. 26).

Plaintiff testified that she has worked as a cashier, a cook, a dietary aide, and a night

auditor at a hotel, but she has never earned $500.00 or more in a month.  (Id.).  Plaintiff confirmed that she worked at the Hampton Inn and J.C. Penney since her alleged onset date, but she did not earn enough at these positions to make it relevant to her case.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she has never worked for an employer long because she has "distorted thinking," and believes that people are out to get her.  (Tr. 27).  Plaintiff stated that she thinks that her co-workers are trying to get her fired or that they do not like her, and she becomes paranoid.  (Id.).

Plaintiff testified that her supervisor at J.C. Penney thought that plaintiff was using the cash register to void purchases and steal money.  (Tr. 28).  Plaintiff stated that her supervisor at her dietary aide position complained that she was not putting dishes away in the proper places, and that she did not work fast enough.  (Id.).

Plaintiff testified that co-workers told her that she was too quiet.  (Tr. 29).  Plaintiff stated that she has difficulty talking to people she does not know well.  (Id.).

Plaintiff testified that she worked as a cashier for two weeks.  (Id.).  Plaintiff stated that a supervisor kept telling her that she was doing things the wrong way, which caused her to experience anxiety and depression.  (Id.).  Plaintiff testified that she eventually just stopped coming to work.  (Id.).

Plaintiff stated that the night auditor position caused her to experience a lot of anxiety because she was the only one working all night, and she started receiving obscene phone calls.  (Tr. 30).  Plaintiff testified that she also thought that parked cars were watching her.  (Id.).  Plaintiff stated that she missed so much work that her supervisor terminated her.  (Id.).

Plaintiff testified that she has had difficulty at jobs her whole life.  (Id.).

Plaintiff stated that she was diagnosed with bipolar disorder,[2] PTSD,[3] anxiety, and depression. (Id.). Plaintiff testified that she received treatment through Pathways, a mental health clinic, in 2008 and 2009. (Id.). Plaintiff stated that she stopped going to Pathways in May or June of 2009 because she was discharged from therapy. (Tr. 31).

Plaintiff stated that she also received treatment from Carol Teague at Dr. Schuetz's office. (Id.).

Plaintiff testified that she saw a psychiatrist, Dr. Fauzia Iqbal, when she was in therapy for a year. (Id.). Plaintiff stated that Dr. Iqbal helped her to understand bipolar disorder, and cope with the disease. (Tr. 32).

Plaintiff testified that, due to her bipolar disorder, she does not sleep well at night because she worries about things. (Id.). Plaintiff stated that, even when she gets enough sleep, she feels tired and does not want to get out of bed due to her depression. (Id.). Plaintiff testified that she has difficulty talking to people due to her anxiety. (Id.). Plaintiff stated that she does not recall having nightmares due to her PTSD, although she occasionally wakes up depressed. (Id.).

Plaintiff testified that she experienced events in her childhood that have caused her a lot of stress and difficulties. (Tr. 33).

Plaintiff stated that she has low energy, low motivation, and no longer enjoys activities.

---

[2]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[3]Posttraumatic stress disorder ("PTSD") is the development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, and a variety of autonomic and cognitive dysfunctions. Stedman's at 570.

(Id.).  Plaintiff's attorney noted that plaintiff was teary-eyed.  (Id.).  Plaintiff stated that she cries approximately once every day or two.  (Id.).  Plaintiff testified that her crying spells sometimes last only a minute or two, and sometimes last days.  (Tr. 34).  Plaintiff stated that she occasionally experiences periods during which she is crying every day most of the day and feels sad and hopeless.  (Id.).  Plaintiff testified that she experienced crying spells while working, and she had to step outside for a moment to pull herself together.  (Id.).  Plaintiff stated that her crying spells can be triggered by anything.  (Id.).

Plaintiff testified that her psychiatric medications work pretty well at first, but their effectiveness eventually decreases.  (Tr. 35).

Plaintiff stated that she has experienced suicidal thoughts in the past.  (Id.).  Plaintiff testified that she locked herself in the bathroom with a knife on one occasion.  (Id.).  Plaintiff stated that she has never been hospitalized overnight due to her psychiatric problems.  (Id.).

Plaintiff testified that the father of her children lives with her and helps her tremendously.  (Tr. 36).  Plaintiff stated that her children's father does not work.  (Id.).  Plaintiff testified that her children's father helps take care of the children, and that the children's grandparents and plaintiff's friends also occasionally help take care of the children.  (Id.).

Plaintiff stated that she drives, but only drives short distances and tries not to go anywhere by herself in case she experiences anxiety.  (Id.).  Plaintiff testified that her anxiety flares when she gets nervous and her thoughts race.  (Id.).  Plaintiff stated that she often gets hot and feels lightheaded.  (Id.).  Plaintiff testified that these problems occur when she shops at a busy store or when she is around a lot of people whom she does not know.  (Id.).  Plaintiff stated that her children's father drove her to the hearing.  (Tr. 37).

Plaintiff testified that she goes to bed between 10:00 p.m and 12:00 a.m. (Id.). Plaintiff stated that she wakes up for the day between 7:00 a.m. and 9:00 a.m. (Id.). Plaintiff testified that she occasionally sleeps soundly, but she experiences muscle spasms in her neck and back, which are very uncomfortable. (Id.).

Plaintiff stated that she has undergone x-rays and MRIs, which have been normal. (Id.). Plaintiff testified that her doctors have suggested that her physical problems are caused by her anxiety or depression. (Id.). Plaintiff stated that her doctors have prescribed additional psychiatric medications but it has not helped her pain. (Id.). Plaintiff testified that she experiences muscle spasms, muscle tension, and headaches. (Id.). Plaintiff stated that she believes her physical problems probably are related to her mental problems because she experiences tension and pain when her mental problems are severe. (Tr. 38).

The ALJ then re-examined plaintiff, who testified that she cooks, although she started cooking more simple meals around December 2008. (Id.). Plaintiff stated that she occasionally washes dishes. (Tr. 39). Plaintiff testified that she sweeps, mops, and does the laundry. (Id.). Plaintiff stated that she does not make the bed or take out the trash. (Id.). Plaintiff testified that she used to garden, but she stopped gardening in the late spring or early summer of 2009. (Id.).

Plaintiff stated that her children were aged one-and-a-half and three. (Id.). Plaintiff testified that she prepares food for her children, bathes them, dresses and undresses them, and changes their diapers. (Tr. 40). Plaintiff stated that she plays with her children, but does not play with them as much as she has in the past. (Id.).

Plaintiff testified that she does not have any hobbies other than occasionally listening to music. (Id.). Plaintiff stated that she has a pet, and that her children's father takes care of the pet.

(Id.).  Plaintiff testified that she used to exercise at home using a workout tape, but she stopped doing this approximately one year prior to the hearing.  (Tr. 41).

Plaintiff stated that she only visits with friends or family when they come to her home. (Id.).  Plaintiff testified that she occasionally calls friends on the telephone.  (Id.).  Plaintiff stated that she occasionally eats out.  (Id.).

Plaintiff testified that she is able to balance a savings and checking account, although she occasionally makes small mistakes and overdraws her account.  (Id.).

Plaintiff stated that she takes care of her own personal hygiene and grooming, although she no longer showers daily.  (Id.).  Plaintiff testified that she does not read newspapers, books, or magazines.  (Id.).  Plaintiff stated that she occasionally uses the computer to pay bills.  (Id.). Plaintiff testified that she has an email account and Myspace account, but she does not check them regularly.  (Tr. 42).

Plaintiff stated that she attended classes at Metro Business from December 2008 through October 2009.  (Id.).  Plaintiff testified that she attended six hours of classes a day, and that she drove to and from class.  (Id.).  Plaintiff stated that her grades were very good in the spring of 2009.  (Id.).  Plaintiff testified that she was enrolled in a year-round program, but she took time off the previous summer because she was under a lot of stress after her brother died.  (Tr. 43). Plaintiff stated that she tried to return to classes in the fall, but she was unable to concentrate due to her depression.  (Id.).  Plaintiff testified that she did well in school prior to her brother's death, but her condition has been worsening since then.  (Id.).

Plaintiff stated that her psychiatric symptoms significantly increased in October of 2009. (Id.).  Plaintiff testified that her psychiatrist is working on adjusting her medications.  (Tr. 44).

Plaintiff's attorney then re-examined plaintiff, who testified that she missed classes even prior to her brother's death in October of 2009.  (Id.).  Plaintiff stated that she occasionally experienced anxiety attacks while in class, and would have to take her medication and step out of class to calm down.  (Id.).  Plaintiff testified that she occasionally left school halfway through the day due to anxiety or depression.  (Id.).  Plaintiff stated that, although she was doing "pretty good" prior to her brother's death, she still had problems.  (Tr. 45).

Plaintiff testified that she received mostly "A"s.  (Tr. 46).  Plaintiff stated that she occasionally received help from teachers, but she was unable to keep up with her school work.  (Id.).  Plaintiff testified that she was taking a full load of classes, and that vocational rehabilitation paid for her classes.  (Id.).  Plaintiff stated that she had not graduated or earned any certificates at the time of the hearing.  (Id.).  Plaintiff testified that she was taking medical classes to work as a medical assistant.  (Tr. 47).

Plaintiff stated that attending school was easier than working in the sense that she was able to talk to a counselor at the school when she was experiencing difficulty with her school work.  (Tr. 48).  Plaintiff testified that the counselor tried to boost her confidence.  (Id.).  Plaintiff stated that school was more difficult than a job because she had deadlines and had to make oral presentations.  (Id.).  Plaintiff testified that it is difficult for her to work or attend school because she does not know until she wakes up how severe her depression or anxiety will be.  (Id.).

The ALJ then examined the vocational expert, Dr. Terry Bartlow, who testified that plaintiff had no past relevant work.  (Tr. 49).  The ALJ asked Dr. Bartlow to assume a hypothetical individual with plaintiff's background and the following limitations: able to understand, remember, and carry out simple and detailed, but not complex instructions; able to

make simple work related decisions, deal with only occasional changes in the work process environment; no contact at all with the general public; and only incidental or superficial contact with co-workers. (Tr. 49-50). Dr. Bartlow testified that the individual could perform light, unskilled work as a price marker (1,100 jobs in Missouri, 77,000 jobs nationally); laundry sorter (560 jobs in Missouri, 37,000 jobs nationally); and garment assembler (500 jobs in Missouri, 37,000 jobs nationally). (Tr. 50).

Plaintiff's attorney then asked Dr. Bartlow to assume the limitations included in the Mental Residual Functional Capacity Assessment completed by Dr. Schuetz on December 1, 2009. (Tr. 51). Dr. Bartlow testified that an individual with these limitations should be able to perform the jobs he previously identified. (Tr. 52). Dr. Bartlow noted that the Mental Residual Functional Capacity Assessment appeared to be based upon plaintiff's subjective complaints. (Tr. 53). Dr. Bartlow testified that, if the subjective complaints were deemed to be accurate, specifically plaintiff's need to remove herself from the workplace due to crying spells, then plaintiff would be unable to maintain employment. (Id.). Dr. Bartlow stated that a GAF score[4] is a snapshot in time, but if a GAF score of 45[5] maintained from 2008 until the time of the hearing, then the claimant would be unable to maintain employment. (Id.).

The ALJ re-examined Dr. Bartlow, who testified that he was distinguishing between a

---

[4]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[5]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

"current GAF score," and a "past year high GAF score." (Tr. 54). Dr. Bartlow stated that plaintiff's GAF score of 45 was in 2008, and that he did not know plaintiff's present GAF score. (Id.). Dr. Bartlow testified that a GAF score can allude to limitations other than occupational problems, such as social problems. (Id.).

## B.  **Relevant Medical Records**

The record reveals that plaintiff presented to the emergency room at Phelps County Regional Medical Center on September 25, 2006, reporting that she saw shadows, and was fearful that the shadows would take her baby away. (Tr. 224). Plaintiff had given birth nineteen days prior. (Id.). Plaintiff was diagnosed with depression and hallucinations related to post-partum psychosis.[6] (Tr. 225, 236). Plaintiff was prescribed Zyprexa,[7] and was instructed to follow-up with a psychiatrist for outpatient counseling. (Tr. 226).

On November 15, 2006, plaintiff presented to a psychiatrist at Community Care Clinic for an initial visit, upon the referral of her OB/GYN. (Tr. 270-71). It was noted that plaintiff's OB/GYN noticed that plaintiff was depressed one-and-a-half weeks after giving birth to her daughter. (Tr. 270). Plaintiff reported that she was sad most of the time, feels like crying, is easily irritated, and doubts herself as a mother. (Id.). Plaintiff reported occasionally feeling like shadows will take her baby. (Id.). Upon mental status examination, plaintiff's mood was sad.

---

[6]An acute mental disorder with depression in the mother following childbirth. Stedman's at 1597.

[7]Zyprexa is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder, and agitation associated with schizophrenia and bipolar I mania. See Physician's Desk Reference ("PDR"), 1884-85 (63rd Ed. 2009).

(Tr. 271).  Plaintiff was diagnosed with major depressive disorder,[8] single episode, severe; and was given a GAF score of 55.[9]  (Id.).  Plaintiff was prescribed Celexa[10] and Zyprexa.  (Id.).

On December 27, 2006, plaintiff reported racing thoughts.  (Tr. 269).  Plaintiff was diagnosed with bipolar affective disorder type II,[11] currently in hypomanic stage.  (Id.).  The psychiatrist discontinued the Zyprexa, continued the Celexa, and started plaintiff on Lamictal.[12]  (Id.).

Plaintiff presented to Community Care Clinic for follow-up on March 21, 2007, at which time plaintiff reported that she was increasingly depressed and lethargic.  (Tr. 268).  Plaintiff was diagnosed with bipolar affective disorder type II.  (Id.).  Plaintiff's dosage of Celexa was increased, and Abilify[13] was added.  (Id.).

On May 2, 2007, plaintiff reported that the Celexa and Abilify were helping with her mood.  (Tr. 267).  Plaintiff was started on Vistaril.[14]  (Id.).

---

[8]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilty, and hopelessness.  Stedman's at 515.

[9]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[10]Celexa is an antidepressant drug indicated for the treatment of depression.  See PDR at 1161.

[11]An affective disorder characterized by the occurrence of alternating, hypomanic and major depressive episodes.  Stedman's at 568.

[12]Lamictal is indicated for the treatment of bipolar disorder.  See PDR at 1491.

[13]Abilify is an antipsychotic indicated for the treatment of bipolar disorder and major depressive disorder.  See PDR at 881.

[14]Vistaril is indicated to relieve itching caused by allergies and to control nausea and vomiting.  It is also used to treat anxiety.  See WebMD, http://www.webmd.com/drugs (last

On November 14, 2007, plaintiff reported that she was four months pregnant. (Tr. 265). Plaintiff was diagnosed with dysthymic disorder[15]/social anxiety/post-partum depression. (Tr. 266). Plaintiff was continued on Vistaril, and counseling was recommended. (Id.).

Plaintiff presented to Pathways Community Behavioral Healthcare, Inc. ("Pathways") on February 6, 2008, for treatment of her mental impairments. (Tr. 287). Plaintiff reported mostly symptoms of depression. (Id.). Plaintiff was twenty-seven weeks pregnant. (Tr. 289). Plaintiff reported using marijuana occasionally, and that she had last used two weeks prior. (Id.). Upon mental status examination, plaintiff's affect was anxious, constricted, and dysphoric; her speech was slowed, with frequent pauses; plaintiff had excessive worries, resentful thoughts, and feelings of persecution; plaintiff's motor activity was decreased; and she had poor insight and judgment. (Tr. 291). Fauzia Iqbal, M.D. diagnosed plaintiff with PTSD; major depressive disorder, recurrent, mild; and cannabis abuse; and assessed a GAF score of 50. (Tr. 293-95).

Mark Altomari, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on February 26, 2008. (Tr. 272-83). Dr. Altomari expressed the opinion that plaintiff's dysthymic disorder and social anxiety resulted in a moderate limitation in plaintiff's ability to maintain social functioning, and mild limitations in activities of daily living and the ability to maintain concentration, persistence, or pace. (Tr. 280). Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, in which he found that plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods, work in

_____

visited November 8, 2012).

[15]Chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. Stedman's at 569.

coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 284-85).

Plaintiff presented to Pathways for follow-up on May 5, 2008, at which time plaintiff reported increased sadness and irritability. (Tr. 296). Plaintiff's dosage of Celexa was increased. (Tr. 297).

Plaintiff presented to Forest City Family Practice on May 7, 2008, with complaints of tension headaches, neck pain, and muscle tightness. (Tr. 366). Carol Teague, FNP diagnosed plaintiff with headaches, neck pain, and GERD.[16] (Tr. 367). Plaintiff was prescribed Naproxen,[17] Robaxin,[18] and Zantac.[19] (Id.).

On May 21, 2008, plaintiff presented to Pathways with complaints of experiencing aggressive thoughts. (Tr. 298). Plaintiff was diagnosed with PTSD, bipolar disorder type II, and personality disorder NOS.[20] (Tr. 299). Plaintiff was prescribed Abilify and Vistaril. (Id.).

Plaintiff presented to Ms. Teague on June 4, 2008, with complaints of muscle tension in

---

[16]Gastroesophageal reflux disease ("GERD") is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

[17]Naproxen is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis. See PDR at 2633.

[18]Robaxin is a muscle relaxer indicated for the treatment of muscle spasms. See WebMD, http://www.webmd.com/drugs (last visited November 8, 2012).

[19]Zantac is indicated for the treatment of GERD. See PDR at 1672.

[20]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment affect, impulse control and interpersonal functioning. Stedman's at 570.

the neck and left shoulder, which was not relieved with Naproxen. (Tr. 370). Ms. Teague diagnosed plaintiff with neck pain and muscle tension, and adjusted plaintiff's medications. (Tr. 371). Plaintiff saw Dr. Schuetz at Forest City Family Practice on June 16, 2008, at which time she reported pain in the right shoulder. (Tr. 372). On July 2, 2008, plaintiff presented to Dr. Schuetz with complaints of back pain and a cyst in her right shoulder. (Tr 374). On July 16, 2008, Dr. Schuetz removed plaintiff's right shoulder cyst. (Tr. 376).

On July 10, 2008, plaintiff presented to Pathways with complaints of sadness and irritability. (Tr. 300). Plaintiff's medications were continued and therapy was recommended. (Id.).

Plaintiff saw Ms. Teague with complaints of muscle tension on August 4, 2008. (Tr. 380).

Plaintiff underwent x-rays of the cervical spine on August 12, 2008, which were unremarkable. (Tr. 382).

Plaintiff saw Dr. Schuetz on August 27, 2008, at which time Dr. Schuetz noted plaintiff's chronic complaints of myalgia[21] in the back and neck. (Tr. 383).

On September 4, 2008, plaintiff presented to Pathways with complaints of some irritability since she stopped smoking. (Tr. 302). Plaintiff indicated that her mood was "okay," and she denied suicidal or homicidal ideations. (Id.). Plaintiff's Vistaril was discontinued and she was started on Klonopin.[22] (Id.). On October 16, 2008, it was noted that plaintiff had been stable, and that she reported that she was starting school in December. (Tr. 304).

Plaintiff presented to Ms. Teague on November 4, 2008, with complaints of middle back

---

[21]Muscular pain. Stedman's at 1265.

[22]Klonopin is indicated for the treatment of panic disorder. See PDR at 2639.

pain for three days.  (Tr. 387).  Ms. Teague diagnosed plaintiff with chronic back pain, and

prescribed Soma.[23]  (Tr. 388).

Ms. Teague completed a Medical Health Status Report on November 21, 2008, in which

she stated that plaintiff was in "apparent good health."  (Tr. 391).  Ms. Teague stated that plaintiff

suffered from bipolar disorder, anxiety, and depression, which were controlled on her current

medication.  (Id.).

On November 12, 2008, therapist Heather Bradshaw, completed an assessment.  Ms.

Bradshaw diagnosed plaintiff with PTSD and bipolar disorder II, and assessed a current GAF

score of 45.  (Tr. 317).  Ms. Bradshaw stated that plaintiff reported difficulties with hypomanic[24]

episodes and depressive episodes, and that she was still struggling to deal with trauma occurring

in her childhood.  (Tr. 317).  Plaintiff reported difficulties with communication in relationships

due to fear of negative response.  (Id.).  Ms. Bradshaw stated that plaintiff appeared to meet the

criteria for a provisional diagnosis of PTSD, as she had a history of sexual abuse as a child,

avoided situations where she would be alone, felt someone or something was going to get her,

recurrent thoughts of the event, and avoidance of memories related to the event.  (Tr. 318).  Ms.

Bradshaw stated that plaintiff's depressive and hypomanic episodes were well-controlled with

medication.  (Id.).  Ms. Bradshaw indicated that plaintiff needed anxiety management skills and

improvement in self-esteem.  (Id.).

Plaintiff presented to Ms. Bradshaw for therapy on November 18, 2008, at which time

---

[23]Soma is indicated for the treatment of acute, painful musculoskeletal conditions.  See PDR at 1931.

[24]A mild degree of mania.  Stedman's at 934.

plaintiff's mood was euthymic and plaintiff reported an increase in stress levels as she was soon beginning school. (Tr. 320). Plaintiff reported that she was arranging child care for her children, and was learning to drive so she could drive to classes. (Id.). On November 25, 2008, plaintiff reported a reduction in anxiety compared with her previous session, and stated life was "going well and things are falling into place." (Tr. 322). Plaintiff reported that she had been driving successfully with very few difficulties. (Id.).

Plaintiff underwent an annual assessment at Pathways on December 3, 2008, at which time plaintiff reported that she was just starting school at Metro Business College and was planning her wedding. (Tr. 324). Plaintiff reported that she was too anxious to drive. (Tr. 325). Plaintiff indicated that attending school was helping with her depression, and that her hypomanic episodes were under control with medication. (Tr. 325-26). Upon mental status exam, plaintiff described her mood as "great." (Tr. 326). Plaintiff was diagnosed with PTSD, bipolar disorder II, personality disorder NOS, and was given a GAF score of 50. (Tr. 332-33). Plaintiff requested continued services "to help [her] out with [her] anxiety and depression when it does bother [her]." (Tr. 335).

Plaintiff saw Ms. Bradshaw for therapy on December 23, 2008, at which time plaintiff reported that things had been going well lately. (Tr. 336). Plaintiff's mood was described as euthymic. (Id.).

Plaintiff saw Ms. Teague with complaints of allergies and chronic back pain on December 30, 2008. (Tr. 400).

Plaintiff saw a psychiatrist at Pathways on January 8, 2009, at which time plaintiff reported that she was doing okay. (Tr. 338). Plaintiff's irritability and anger were under control.

(Id.).  Plaintiff's medications were adjusted.  (Id.).

Plaintiff saw Ms. Bradshaw for therapy on January 14, 2009, at which time plaintiff reported a slight increase in panic-related symptoms when in the presence of a full classroom. (Tr. 340).  Plaintiff reported that she had been attending classes and completing assignments with no difficulty whatsoever, and had managed to keep her grades in a highly satisfactory range. (Id.).  On January 21, 2009, plaintiff reported anxiety because her son was sick and she was unable to attend classes.  (Tr. 342).  Plaintiff indicated that she had passed her driving test, and she was making all A's in school.  (Id.).

Plaintiff saw Ms. Teague on January 29, 2009, at which time she complained of insomnia due to her Wellbutrin.[25]  (Tr. 402).

Plaintiff saw Ms. Bradshaw on February 11, 2009, at which time plaintiff reported no problems with depressive symptoms or anxiety.  (Tr. 344).  Plaintiff indicated that she was doing very well in school, attending all classes, and was on the honor roll.  (Id.).  Plaintiff was enjoying the freedom of driving wherever she wanted to go, and indicated that she had not experienced any panic attacks in the past month and was feeling very "put together" overall.  (Id.).

Plaintiff saw the psychiatrist at Pathways for medication management on March 4, 2009, at which time plaintiff's Wellbutrin was discontinued due to reported side effects.  (Tr. 346).

Plaintiff saw Ms. Bradshaw for therapy on March 4, 2009, at which time plaintiff reported many positive changes in her life, and reported a significant decrease in her depression.  (Tr. 348). Plaintiff indicated that she had finished her semester of school and had received 100 percent

---

[25]Wellbutrin is an antidepressant drug indicated for the treatment of major depressive disorder.  See PDR at 1649.

grades on both of her final examinations.  (Id.).  Plaintiff reported that she has continued to excel at balancing home and school.  (Id.).  Plaintiff had experienced no panic attacks in recent weeks. (Id.).  Plaintiff was discharged from therapy due to her ability to maintain progress for "quite some time."  (Id.).

Plaintiff saw Ms. Teague for medication refills on April 7, 2009.  (Tr. 404).  On May 12, 2009, plaintiff complained of chronic back pain.  (Tr. 409).  Ms. Teague prescribed Flexeril.[26] (Id.).

Plaintiff saw the psychiatrist at Pathways for medication management on May 13, 2009, at which time it was noted that plaintiff was doing okay and was compliant with medication.  (Tr. 350).  Plaintiff reported no mood swings.  (Id.).

Plaintiff underwent an MRI of the cervical spine on May 19, 2012, which was normal. (Tr. 410).

Plaintiff saw Ms. Teague on June 12, 2009, with complaints of neck pain.  (Tr. 411). Upon examination, Ms. Teague noted tenderness to palpation of the cervical neck.  (Tr. 412).  On June 19, 2009, plaintiff reported that she had been discharged from Pathways, and that she would now receive her medications from her primary care doctor.  (Tr. 413).  Plaintiff's medications were adjusted.  (Tr. 414).  On July 3, 2009, plaintiff reported that she still had muscle spasms. (Tr. 415).  Tenderness to palpation and muscle tension were noted at the cervical spine.  (Tr. 416).  Plaintiff's medications were adjusted.  (Id.).  On July 28, 2009, plaintiff complained of left ankle pain.  (Tr. 417).  Upon examination, tenderness to palpation was noted of the left ankle.

---

[26]Flexeril is indicated for the treatment of muscle spasms.  See WebMD, http://www.webmd.com/drugs (last visited November 8, 2012).

(Tr. 418).  Plaintiff was diagnosed with chronic back pain, left ankle pain, and GERD.  (Id.).
Plaintiff's medications were adjusted.  (Id.).

On December 1, 2009, Ms. Teague completed a Mental Residual Functional Capacity
Assessment Form, which was reviewed by Dr. Schuetz.  (Tr. 355-59).  With regard to plaintiff's
activities of daily living, Ms. Teague found that plaintiff had marked limitations in her ability to
cope with stress, noting that plaintiff had to withdraw from school on October 22, 2009;
moderate limitations in her ability to behave in an emotionally stable manner and relate in social
situations; slight limitations in her ability to maintain personal appearance and reliability; and no
limitations in her ability to care for herself, meet her personal needs, or function independently.
(Tr. 355).  With respect to plaintiff's social functioning, Ms. Teague expressed the opinion that
plaintiff had moderate limitations in her ability to relate in social situations and interact with the
general public due to her anxiety; and slight limitations in her ability to maintain socially
acceptable behavior and adhere to basic standards of cleanliness.  (Tr. 356).  Concerning
plaintiff's concentration, understanding and memory, Ms. Teague found that plaintiff had a
marked limitation in her ability to understand and carry out complex instructions since October
2009; moderate limitations in her ability to remember work-like procedures since October 2009,
understand and remember short and simple instructions since October 2009, understand and
remember detailed instructions since October 2009, maintain attention and concentration for
extended periods since October 2009, maintain regular attendance and be punctual, and complete
a normal workday and workweek without interruptions from psychologically based symptoms,
and perform at a consistent pace without an unreasonable number and length of rest periods; and
a slight limitation in her ability to make simple work-related decisions.  (Tr. 357).  Ms. Teague

indicated that plaintiff had repeated episodes of deterioration, noting that plaintiff has quit jobs and school due to increased episodes of depression and anxiety. (Tr. 358). Finally, with regard to plaintiff's occupational ability, Ms. Teague found that plaintiff's ability to deal with the public, deal with work stresses, and maintain attention since October 2009 were "fair," while her ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, function independently, respond to changes in work setting, and be aware of normal hazards were "good." (Id.). When asked to describe findings in support of her assessment, Ms. Teague stated that plaintiff was having increased depression and anxiety since October 2009, and that her goal was to optimize medical management so that plaintiff was able to finish school and maintain employment. (Tr. 359). Ms. Teague noted that her assessment was completed with plaintiff present, and that plaintiff's input as to her limitations was used to complete the form. (Id.).

Ms. Teague also completed a Physical Residual Functional Capacity Assessment Form, which was reviewed by Dr. Schuetz. (Tr. 360-64). Ms. Teague expressed the opinion that plaintiff was able to sit for two to three hours in an eight-hour workday, stand for one hour, walk for one hour, and work for two to three hours. (Tr. 360). Ms. Teague found that plaintiff could frequently lift and carry up to ten pounds, and occasionally lift and carry up to fifty pounds. (Id.). Ms. Teague indicated that plaintiff could only occasionally bend, squat, crawl, and climb; and could frequently reach above, stoop, crouch, and kneel. (Tr. 362). When asked to indicate the medical findings in supports of these limitations, Ms. Teague stated that her responses were based on plaintiff's reports of her limitations. (Tr. 360, 362). Ms. Teague found that plaintiff could not tolerate any exposure to unprotected heights, and could tolerate occasional exposure to moving machinery, and noise. (Tr. 362). As support for this finding, Ms. Teague stated that plaintiff

reported that she could experience increased anxiety if exposed to increased sound. (Id.). Ms. Teague stated that plaintiff experiences moderate neck and back pain, as reported by plaintiff. (Id.). Ms. Teague indicated that the following objective indicators of pain were present: muscle spasm and reduced range of motion. (Tr. 363). Ms. Teague stated that sitting or standing longer than one hour incite plaintiff's pain, while muscle relaxers, pain medication, and limiting activity relieve plaintiff's pain. (Tr. 364). When asked whether there were medical reasons plaintiff should not work, Ms. Teague stated "yes," explaining that plaintiff was having increased depression and anxiety since October 2009, although the goal was to medically optimize medical management so that plaintiff could return to school and maintain employment. (Id.). Finally, Ms. Teague stated that her assessment was completed with plaintiff present, and that plaintiff's input as to her limitations was used to complete the form. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.   Born on July 5, 1987, the claimant had not attained age 22 as of September 16, 2006, the alleged onset date (20 CFR 404.102(c)(4) and 404.350(a)(5)).

2.   The claimant has not engaged in substantial gainful activity since September 16, 2006, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.   The claimant has the following "severe" mental impairments: post traumatic stress disorder; bipolar disorder, II; and history of cannabis abuse (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination if impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: ability to

understand, remember, and carry out simple instructions; ability to make only simple work related decisions; ability to deal with only occasional changes in work processes and environment; have no contact with the general public; and while not necessarily working in isolation, the claimant can have only incidental, superficial work-related contact with co-workers.

6.     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on July 5, 1987 and was 19 years old, which is defined as a younger individual age 18-49, on the alleged disability onset dat (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 16, 2006, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 11-17).

The ALJ's final decision reads as follows:

Based on the application for child's insurance benefits protectively filed on November 1, 2007, the claimant was not disabled as defined in section 223(d) of the Social Security Act prior to July 4, 2009, the date she attained age 22.

Based on the application for supplemental security income protectively filed on November 1, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 17).

<h3 style="text-align:center">Discussion</h3>

**A.    Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.**      **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining the credibility of her subjective complaints.  Plaintiff next contends that the ALJ erred in failing to consider, in combination, all of plaintiff's impairments.  Plaintiff finally argues that the ALJ erred in determining plaintiff's RFC. The undersigned will discuss plaintiff's claims in turn.

**1.**      **Credibility Analysis**

Plaintiff argues that the ALJ erred in discrediting plaintiff's subjective complaints due to

her daily activities.  Defendant contends that the ALJ properly assessed plaintiff's credibility.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

"'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'"  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2008));  accord Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011).  Additionally, although "ALJs "must acknowledge and consider [the] . . . Polaski factors before discounting a claimant's subjective complaints, . . . ALJs 'need not explicitly discuss each Polaski factor.'"  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005));  accord Buckner, 646 F.3d at 559 (holding that an ALJ's credibility findings are not negated by a failure to cite Polaski when the relevant factors are considered); Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (holding that although ALJ was required to make express credibility determinations, he "was not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those

considerations before discounting [the claimant's] subjective complaints").

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. The ALJ first discussed plaintiff's daily activities. (Tr. 15). The ALJ noted that plaintiff testified that she was doing "pretty good" until her symptoms increased in October 2009 when her brother died. (Tr. 15, 45). The ALJ stated that, even after October 2009, plaintiff was able to cook, do dishes occasionally, sweep, mop, do laundry, drive, care for her two young children, visit with friends, talk to friends on the phone, and use email. (Tr. 15, 38-42). The ALJ noted that plaintiff attended classes at a business college from December 2008 through October 2009, driving herself to classes and attending classes six hours a day. (Tr. 15, 42). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ properly found that plaintiff's activities of daily living were not consistent with the alleged severity of her pain and symptoms.

Plaintiff argues that the ALJ did not inquire into the specifics of plaintiff's daily activities and did not seek information regarding any difficulties plaintiff may have in performing those activities. The record refutes plaintiff's claim. The ALJ fully inquired into plaintiff's daily activities, including her ability to cook, perform household chores, perform yard work and gardening, drive, take care of her children, engage in hobbies or recreational activities, visit with friends and family, take care of finances, and take care of personal hygiene. (Tr. 38-42). While plaintiff did testify as to some limitations in performing these activities, the ALJ properly pointed out that plaintiff's daily activities were inconsistent with her allegations of disability.

Plaintiff points to the Third Party Function Report completed in November 2007 by

plaintiff's fiancee, Dean Graen, as supportive of plaintiff's allegations of disabling limitations. Although Mr. Graen stated that plaintiff has some difficulties performing daily activities, and that plaintiff experiences anxiety around people, he also indicated that plaintiff takes care of their baby, including feeding, bathing, playing, teaching, and "all care;" feeds, waters, and bathes pets; prepares simple meals; does some laundry, and performs household chores; shops for groceries; pays bills and handles a savings account; spends time with family; and plays games. (Tr. 176-83). Mr. Graen's report is not supportive of plaintiff's allegations of disability but, rather, is consistent with the ALJ's finding.

The ALJ also found that the objective medical evidence was not supportive of plaintiff's allegations of disability. (Tr. 21). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). With regard to plaintiff's physical impairments, the ALJ noted that, although plaintiff has sought treatment for neck and back pain as well as headaches, cervical spine x-rays and MRI studies performed in August 2008 and May 2009 were normal. (Tr. 12, 382, 410). The ALJ also pointed out that there were no significant findings on examination.

With respect to plaintiff's mental impairments, the ALJ acknowledged that plaintiff was treated for postpartum depression and psychosis after giving birth in September 2006, and that plaintiff subsequently received outpatient mental health treatment and medication management for diagnoses varying from major depressive disorder, bipolar disorder, situational anxiety, dysthymic disorder, and PTSD. (Tr. 12). The ALJ pointed out that plaintiff reported that she was doing

well in school in December 2008, and January 2009. (Tr. 12, 324, 336, 340). In February 2009, plaintiff indicated that she was on the honor roll, attending all classes, and was doing well overall. (Tr. 12, 344). Plaintiff also reported that she had not experienced any panic attacks in the prior month. (Id.). In March 2009, plaintiff reported that she excelled at balancing her home and school life. (Tr. 12, 348). Plaintiff was discharged from therapy because she had been doing well for an extended period. (Id.).

Plaintiff argues that plaintiff had a history of low GAF scores. The ALJ acknowledged that plaintiff had GAF scores of 55 in November 2006, 50 in February 2008, 45 in November 2008, and 50 in December 2008. (Tr. 15, 271, 293, 317, 332). The ALJ stated that such low GAF scores were inconsistent with plaintiff's activities, specifically her ability to attend school from December 2008 through October 2009. (Tr. 15). The ALJ also noted that, as stated by the vocational expert, a "current GAF" score is only a snapshot, and is no indication of what plaintiff's highest GAF score was for any twelve-month period. (Tr. 15, 53). Finally, the ALJ accurately pointed out that GAF scores are not intended for the assessment of disability. (Tr. 15). See DeBoard v. Comm'r of Soc. Sec., 211 Fed. Appx. 411, 415 (6th Cir. 2006) (noting that the Commissioner has declined to endorse the GAF scale for use in the disability programs) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's

complaints of disabling pain and limitations are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining plaintiff's RFC.  Specifically, plaintiff contends that the ALJ failed to consider plaintiff's physical impairments, combination of impairments, and plaintiff's descriptions of her limitations.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: ability to understand, remember, and carry out simple instructions; ability to make only simple work related decisions; ability to deal with only occasional changes in work processes and environment; have no contact with the general public; and while not necessarily working in isolation, the claimant can have only incidental, superficial work-related contact with co-workers.

(Tr. 14).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

In determining plaintiff's RFC, the ALJ first discussed the opinion evidence. (Tr. 15-16). The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Still, the opinion of the treating physician is not conclusive in determining disability status,

and must be supported by medically acceptable clinical or diagnostic data. <u>Casey</u>, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005); <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000).

The ALJ indicated that he was assigning "little weight" to the assessments of plaintiff's physical and mental capacity completed by Ms. Teague on December 1, 2009. (Tr. 355-59, 360-64). The ALJ noted that Ms. Teague's assessments indicate that they are based on plaintiff's reported limitations and, thus, not on objective medical signs and findings. (Tr. 15). The ALJ also pointed out that a nurse practitioner is not an acceptable medical source and that, although the reports were reviewed by Dr. Schuetz, they were not necessarily approved by Dr. Schuetz. (Tr. 15). Although a nurse practitioner is not an acceptable medical source whose evidence can establish an impairment, <u>see</u> 20 C.F.R. §§ 404.1514(a), 416.913(a), evidence from a nurse practitioner may be considered when assessing the severity of an impairment. <u>See</u> 20 C.F.R. §§ 404.1513(d)(1), 416.923(d)(1).

Ms. Teague explicitly stated that her assessments were completed with plaintiff present, and that plaintiff's "input as to limitations was used to complete [the] form[s]." (Tr. 359, 364). In addition, when asked to indicate the medical findings in support of her opinion with regard to plaintiff's physical limitations, Ms. Teague stated that her opinions were based on plaintiff's "report of limitations." (Tr. 360, 362). Thus, the ALJ properly found that Ms. Teague's opinions were entitled to little weight because they were based on plaintiff's subjective complaints. <u>See</u> <u>McCoy v. Astrue</u>, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of

weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible."). See also Renstrom, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts).

The ALJ next indicated that he had considered the opinion of the non-examining state agency psychologist, Dr. Altomari, who found that plaintiff retained the capacity to understand, remember and carry out simple and detailed directions; relate appropriately to co-workers and supervisors in small numbers and for short periods of time; adapt to routine changes in the workplace; and make simple work-related decisions. (Tr. 16, 284-85). The ALJ stated that he was assigning "great weight" to this opinion, as it was well supported and was consistent with the record when viewed in its entirety. (Tr. 16). The ALJ indicated that his RFC assessment was consistent with the opinion of Dr. Altomari, although he noted that he was giving plaintiff the benefit of the doubt. (Tr. 16). While more weight is generally given to the opinion of an examining source than to the opinion of a non-examining source, state agency medical consultants are highly qualified physicians who are also experts in Social Security disability evaluation, and ALJs must consider their findings as opinion evidence. See 20 C.F.R. §§ 404.1527(d)(1); 404.1527(f)(2)(I).

After discussing the medical opinion evidence, the ALJ concluded that his RFC assessment was supported by the medical evidence of record considered as a whole, the opinion of the state

agency psychologist, and plaintiff's activities of daily living, including attending school and caring for her young children.  (Tr. 16).

The undersigned finds that the RFC formulated by the ALJ is supported by substantial evidence in the record as a whole.  As previously discussed, the ALJ properly found that plaintiff's allegations of disabling limitations were not credible based on plaintiff's activities of daily living, including successfully attending school for a ten-month period, and taking care of her two young children.  With regard to plaintiff's physical impairments, despite plaintiff's complaints of pain, objective testing revealed no abnormalities.  The medical evidence from Pathways reveals that plaintiff's mental impairments continued to improve with treatment, resulting in plaintiff being discharged from therapy on March 4, 2009.  (Tr. 348).  At that time, plaintiff reported that she excelled at balancing home and school, and reported no panic attacks.  (Id.).

Although plaintiff reported a subsequent increase in psychiatric symptoms after her brother's death in October 2009, the record is not supportive of disability.  As discussed above, plaintiff continued to engage in significant daily activities.  In addition, the ALJ took into account plaintiff's October 2009 increase in symptoms in formulating a more restrictive RFC than that of the state agency psychologist.  Further, despite plaintiff's arguments to the contrary, the ALJ considered all of plaintiff's impairments in combination.  The ALJ discussed plaintiff's testimony and the medical records regarding all of her physical and mental complaints, but found that plaintiff retained the capacity to perform work activity.  The RFC determined by the ALJ is supported by substantial evidence in the record as a whole.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a child's disability insurance benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.

Dated this 8th  day of January, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE